# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TOWN OF BARNSTABLE,
MASSACHUSETTS,

Plaintiff,

v.

KENNETH SALAZAR, in his official capacity as
the Secretary of the Interior, U.S. Department of
the Interior, et al.,

Defendants,

and

CAPE WIND ASSOCIATES, LLC,

Intervenor.

Civil No. 10-cv-01073-RMU

## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT
## AND MEMORANDUM IN SUPPORT

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.     Statutory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.     National Environmental Policy Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     B.     Outer Continental Shelf Lands Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     C.     Coast Guard and Maritime Transportation Act . . . . . . . . . . . . . . . . . . . 5

     D.     National Historic Preservation Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     E.     The Administrative Procedure Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     A.     The Cape Wind Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     B.     Record of Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     C.     Plaintiff's Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III.   Standards of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     A.     Motion to Dismiss Under Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . 14

     B.     Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . 15

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.     The Court Lacks Jurisdiction Over Plaintiff's Claims Because They Are Not Ripe
     for Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     A.     Plaintiff Must Demonstrate that Its Claims Are Ripe for Review . . . . . . . . . . 16

     B.     Plaintiff's NEPA Claims Are Not Ripe for Review . . . . . . . . . . . . . . . . . . 18

          1.     Plaintiff's NEPA Claims Are Not Constitutionally Ripe
              for Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

i

2.      Plaintiff's NEPA Claims Are Not Prudentially Ripe for Review . . . . . . 25

a.      The Court Evaluation of Plaintiff's Claims Will
Benefit from Further Factual Development . . . . . . . . . . . . . . . . 25

b.      A Court Decision on Plaintiff's NEPA Claims
May Interfere With Ongoing Regulatory Processes . . . . . . . . . . 26

c.      Deferring Judicial Review Would Not Harm
Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

C.      Plaintiff's OCSLA Claims Are Not Ripe for Review . . . . . . . . . . . . . . . . . . . . 27

D.      Plaintiff's CGMTA Claims Are Not Ripe for Review . . . . . . . . . . . . . . . . . . . 28

E.      Plaintiff's NHPA Claims Are Not Ripe for Review . . . . . . . . . . . . . . . . . . . . . 30

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## TABLE OF ACRONYMS

Administrative Procedure Act (APA)

Advisory Council on Historic Preservation (ACHP)

Alliance to Protect Nantucket Sound (APNS)

Application for Permit to Drill (APD)

Area of Potential Effect (APE)

Bureau of Land Management (BLM)

Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE)

Cape Wind Associates, LLC (CWA)

Council on Environmental Quality (CEQ)

Coast Guard and Maritime Transportation Act (CGMTA)

Construction and Operations Plan (COP)

Energy Policy Act (EPAct)

Environmental Assessment and Finding of No New Significant Impact (EA/FONNSI)

Environmental Impact Statement (EIS)

Federal Onshore Oil and Gas Leasing Reform (FOOGLRA)

Minerals Management Service (MMS)

National Environmental Policy Act (NEPA)

National Historic Preservation Act (NHPA)

National Marine Fisheries Service (NMFS)

Marine Transportation Security Act (MTSA)

Minerals Management Service (MMS)

Outer Continental Shelf (OCS)

Outer Continental Shelf Lands Act (OCSLA)

Ports and Waterways Safety Acts (PWSA)

Record of Decision (ROD)

Site Assessment Plan (SAP)

State Historic Preservation Officer (SHPO)

Surface Use Plan of Operation (SUPO)

## INTRODUCTION

Defendants Bureau of Ocean Energy Management, Regulation, and Enforcement ("BOEMRE") *et al.* hereby move to dismiss the Complaint filed by Plaintiff Town of Barnstable, Massachusetts ("Barnstable") for lack of jurisdiction.  Plaintiff challenges the decision by BOEMRE to issue a lease to Cape Wind Associates LLC ("CWA") for the potential development of a wind energy facility in Nantucket Sound.  Plaintiff's claims are brought under the National Environmental Policy Act ("NEPA"), the Outer Continental Shelf Lands Act ("OCSLA"), the Coast Guard and Maritime Transportation Act ("CGMTA"), and the National Historic Preservation Act ("NHPA").  Significantly, the decision by BOEMRE to issue a lease to CWA does not authorize any construction or operation relating to the development of a wind energy facility.  Rather, the leasing decision is a preliminary decision authorizing CWA to conduct site assessment activities and granting it the exclusive right to develop and submit a plan for construction and operation of a wind energy facility.

Plaintiff's claims relate to the potential effects of the approval of construction and operation of such a facility, not the mere granting of a lease.  CWA has yet to submit a complete plan for construction and operation of a wind energy facility.  In the event that CWA submits a complete Construction and Operations Plan ("COP"), BOEMRE will consider additional information, including reports prepared by other federal agencies and by CWA, before deciding whether to approve, approve with modifications, or disapprove the construction and operation of a wind energy facility.  Additionally, and as required by NEPA and BOEMRE regulations, BOEMRE will conduct the appropriate environmental reviews before deciding whether to approve the construction and operation of a wind energy facility in Nantucket Sound.  BOEMRE retains the authority to approve or deny any construction in Nantucket Sound even after a COP is submitted.  Accordingly, unless

and until BOEMRE actually makes a decision to approve a COP, it would be premature for the Court to determine whether BOEMRE has complied with the statutory requirements of NEPA, OCSLA, and the NHPA and whether the U.S. Coast Guard has complied with the statutory requirements of the CGMTA.  Therefore Plaintiff's claims are not ripe for review.

## BACKGROUND

### I.      Statutory Background

#### A.      National Environmental Policy Act

NEPA serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions and ensuring that relevant information is made available to the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision."  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989).  To meet these dual purposes, NEPA requires that an agency prepare an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.  The Council on Environmental Quality's ("CEQ") regulations implementing NEPA provide that, when an agency is considering a major federal action that could have significant environmental impacts, the EIS should include an analysis of alternatives to the proposed action, 40 C.F.R. § 1502.14, a discussion of direct, indirect, and cumulative impacts, id. §§ 1502.16 (a)-(b), 1508.7, 1508.8, and means to mitigate adverse environmental impacts from the proposed action.  Id. § 1502.16(h).

Under CEQ's regulations, when preparing an EIS, the responsible agency must prepare a draft EIS and solicit public comments.  40 C.F.R. § 1503.1.  The agency must then "assess and consider" the comments in drafting the final EIS, and notice of the availability of the final EIS must

be published in the Federal Register.  Id. §§ 1503.4, 1506.10(b).  When the agency makes its decision regarding the proposed action and alternatives discussed in the final EIS, the agency must "prepare a concise public record of decision."  40 C.F.R. § 1505.2.  The record of decision must state the agency's decision, identify the alternatives considered by the agency, and explain the reasons for reaching its decision.  Id.

### B.      Outer Continental Shelf Lands Act

In 2005, Congress passed the Energy Policy Act, ("EPAct"), Pub. L. 109-58, 119 Stat. 594 (Aug. 8, 2005).  Section 388(a) of EPAct, codified in Subsection 8(p) of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1337(p), authorizes the Secretary of the Interior to issue leases, easements, or rights-of-way for offshore renewable energy projects.  See EPAct § 388, 119 Stat. at 748.  EPAct contained a "savings provision" stating that section 388 did not "require[ ] the resubmittal of any document that was previously submitted or the reauthorization of any action that was previously authorized with respect to a project for which, before the date of the enactment of this Act – (1) an offshore test facility has been constructed; or (2) a request for a proposal has been issued by a  public authority."  119 Stat. at 747.  Under Subsection 8(p) of OCSLA, the Secretary, in consultation with the U.S. Coast Guard and other relevant federal agencies, may grant a lease, easement, or right-of-way on the Outer Continental Shelf ("OCS") for the purpose of producing or supporting production, transportation, or transmission of energy from sources other than oil or natural gas.  43 U.S.C. § 1337(p)(1)(C).  The Secretary shall ensure that activities carried out under Subsection 8(p) are carried out in a manner that provides for public safety, environmental protections, prevention of waste, and conservation of the natural resources.   43 U.S.C. § 1337(p)(4)(A)-(D).

BOEMRE issued regulations that govern the leasing process and management of offshore renewable energy projects.  See 30 C.F.R. Part 285; see also Renewable Energy and Alternate Uses of Existing Facilities on the Outer Continental Shelf, 74 Fed. Reg. 19638 (April 29, 2009).  The leasing and offshore energy development process established by the regulations is staged in order to ensure that renewable energy resources are developed in a manner that is safe, environmentally sound, and orderly.  The principle first step is BOEMRE's issuance of a lease allowing an applicant to seek approval for the development of an offshore electrical generation facility.  30 C.F.R. § 285.200.  The lease does not grant the applicant the right to construct any facilities; rather, the lease grants the right to use the leased area to subsequently develop an offshore renewable energy project "subject to obtaining the necessary approvals" from BOEMRE and other agencies.  30 C.F.R. § 285.200(a).  The second step is the submission of a Site Assessment Plan ("SAP"), which must be approved by BOEMRE before the lessee conducts site assessment activities at the lease site.  30 C.F.R. §§ 285.600, 285.605.  In the SAP, the applicant must describe the activities that it plans to conduct in gathering information for the development of the lease site, such as the construction of meteorological towers and conducting baseline environmental surveys.  30 C.F.R. § 285.605.  BOEMRE is required to prepare "NEPA analysis, as appropriate" in conjunction with its determination on whether to approve a SAP.  30 C.F.R. § 285.613(b).  The SAP describes the activities the lessee will undertake to obtain and develop the information necessary to prepare a COP.  30 C.F.R. § 285.618.  Finally, the third step is the submission of a COP and a decision by BOEMRE to approve, approve with modifications, or disapprove the COP.  30 C.F.R. §§ 285.600, 285.620.  The approval of a COP is a precondition to any construction of an offshore renewable

energy facility.  Id.  BOEMRE must prepare "an appropriate NEPA analysis" before deciding whether to approve a COP.  30 C.F.R. § 285.628(b).

### C.    Coast Guard and Maritime Transportation Act

Roughly a year after EPAct was enacted, Congress passed the Coast Guard and Maritime Transportation Act of 2006 ("CGMTA"), Pub. L. 109-241, 120 Stat. 516 (July 11, 2006).  Section 414 of the CGMTA relates specifically to the issuance of a lease for an offshore wind energy facility in Nantucket Sound.  120 Stat. at 540.  Under § 414(a), no later than 60 days before the publication of a draft EIS for such a project, "the Commandant of the Coast Guard shall specify the reasonable terms and conditions the Commandant determines to be necessary to provide for navigational safety with respect to the proposed lease, easement, or right of-way and each alternative to the  proposed lease, easement, or right-of-way considered by the Secretary [of the Interior]."  Id.  The Secretary is required to incorporate the Commandant's terms and conditions into a lease for the development of a wind energy facility in Nantucket Sound.  Id.

### D.    National Historic Preservation Act

Like NEPA, Section 106 of the NHPA is a "stop, look, and listen' provision."  Illinois Commerce Com'n v. I.C.C., 848 F.2d 1246, 1261 (D.C. Cir. 1988); see also Karst Environmental Educ. and Protection, Inc. v. E.P.A.,  475 F.3d 1291, 1295-96 (D.C. Cir. 2007) (noting the "operational similarity" between NEPA and the NHPA).  Under the NHPA, prior to funding or licensing an undertaking, a federal agency "must (1) take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register, and (2) afford the Advisory Council on Historic Preservation ... a reasonable

opportunity to comment with regard to such undertaking." <u>Karst</u>, 475 F.3d at 1294 (internal quotation marks omitted), citing 16 U.S.C. § 470f.

NHPA regulations at 36 C.F.R. Part 800 set forth the multi-step process for complying with the procedural requirements of Section 106.  First, the agency determines whether the proposed action is an "undertaking" as defined in 36 C.F.R. § 800.16(y), and if so, the agency identifies appropriate parties to participate in the Section 106 review, including the State Historic Preservation Officer ("SHPO") and other "consulting parties," including Indian tribes.  36 C.F.R. § 800.3. Second, the agency  identifies historic properties and evaluates their significance in consultation with the SHPO, and any Indian tribe that might attach religious and cultural significance to properties within the area of potential effect ("APE").  36 C.F.R. § 800.4.  Third, the agency assesses whether there are adverse effects on those historic properties in consultation with the SHPO and other consulting parties, and fourth, the agency endeavors to resolve any adverse effects in consultation with the SHPO and other consulting parties.  36 C.F.R. §§ 800.5, 800.6.  In the event that an agency determines that further consultation to resolve adverse effects "will not be productive," the agency may terminate consultation and shall notify the other consulting parties and provide them the reasons for the termination in writing.  36 C.F.R. § 800.7.  The agency must request comments from the Advisory Council on Historic Preservation ("ACHP") and notify all the consulting parties of the request.  36 C.F.R. § 800.7(a)(1); <u>see</u> <u>also</u> 36 C.F.R. § 800.11(g).  ACHP must provide comments within forty-five days to the agency and the consulting parties.  36 C.F.R. § 800.7(c).  The head of the agency is required to take into account those comments in reaching a final decision and document the decision by preparing a summary of the rationale for the decision

and providing evidence that ACHP's comments were considered.  The decision must be provided to the consulting parties and the public must be notified.  Id.

### E.    The Administrative Procedure Act

The substantive statutes under which Plaintiff has brought suit contain no private right of action, and, consequently, must be brought pursuant to the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*  See Karst Env't. Educ. and Prot., Inc. v. EPA, 475 F.3d 1291, 1295 (D.C. Cir. 2007); Public Citizen v. U.S. Trade Representative, 5 F.3d 549, 551 (D.C. Cir. 1993).  The APA waives the Government's sovereign immunity and provides a limited cause of action "for parties adversely affected by agency action." Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 185 (D.C. Cir. 2006); see also 5 U.S.C. §§ 702, 704.  Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  The APA, however, limits judicial review to "final agency action for which there is no adequate remedy in a court."  5 U.S.C. § 704.  Further, "[a] preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."  Id.

## II.    Factual Background

### A.    The Cape Wind Project

CWA proposes to construct a wind energy facility in Horseshoe Shoal on the OCS in Nantucket Sound.  Record of Decision ("ROD") at 3, Def. Ex. 1.[1/]  If constructed, the project would involve 130 wind generators, each with a maximum blade height of approximately 440 feet. Id.  The

---

[1/]     "Def. Ex." refers to the exhibits to the Declaration of Luther L. Hajek submitted herewith.

wind turbines would be located in a grid pattern between Cape Cod, Martha's Vineyard and Nantucket Island.  Id.  The wind turbines would generate an average of 182 megawatts and have a maximum electrical output of 468 megawatts.  Id.  The turbines would be connected to a service platform by buried underwater cables.  Id.  A buried underwater transmission cable would connect the service platform to the shore at Yarmouth, Massachusetts.  Id.

In 2001, CWA submitted an application to construct and operate a wind energy facility to the U.S. Army Corps of Engineers ("Corps"), which was initially responsible for regulatory oversight of the project.  Id. at 3.  The Corps prepared a draft EIS in November 2004.  Id. When EPAct was enacted in 2005, CWA's application was transferred from the Corps to BOEMRE, which was then called the Minerals Management Service ("MMS").  Id.   Under the savings provision in EPAct, CWA was not required to submit materials that it had already submitted to the Corps.  Id.; EPAct § 388(d), 119 Stat. at 747.  Because CWA had already obtained approval from the Corps to conduct site assessment activities and had been conducting such activities, including the construction of a meteorological tower, MMS considered that, for purposes of the new regulatory scheme, a SAP had already been approved.  See ROD at 3-4.  MMS determined, however, that CWA was required to submit additional materials and would have to comply with the regulatory requirements for submission of a COP before MMS could deem a COP complete.  BOEMRE has not received or considered a completed COP for CWA's proposed wind facility.  Consequently, BOEMRE has not yet reached the point in its decisionmaking process where it can decide whether or not to approve construction and operation of CWA's proposed wind facility.  See id. at 4-5.

When the responsibility for processing CWA's application was delegated to MMS, MMS determined that a new draft EIS was required and requested comments on the scope of the draft EIS on May 30, 2006.  ROD at 3; 71 Fed. Reg. 30693 (May 30, 2006).  Acting in compliance with CGMTA § 414, the Coast Guard submitted its Terms and Conditions for the proposed Cape Wind Project to MMS 60 days prior to the publication of the draft EIS on August 2, 2007.  ROD at 44. After considering the scoping comments, as well as comments submitted regarding the Corps' draft EIS, MMS distributed its draft EIS on January 18, 2008.  Id. at 3.  MMS held a 60-day public comment period on the draft EIS and conducted four public meetings. Id.  MMS considered the 42,000 comments submitted and issued the final EIS on January 21, 2009.  Id.; 74 Fed. Reg. 3635 (Jan. 21, 2009).

Following the preparation of the final EIS, MMS prepared a preliminary Environmental Assessment and a draft Finding of No New Significant Impact ("EA/FONNSI") for the purpose of determining whether there were any significant new circumstances or information regarding the potential environmental effects of the project that would trigger the need to prepare a supplemental EIS.  ROD at 4; 43 C.F.R. § 46.140.  The preliminary EA and draft FONNSI were circulated for public comment on March 8, 2010.  ROD at 4.  MMS concluded that there were no significant new circumstances or information that would change the analysis provided in the EIS.  Id.  Therefore, after considering public comments on the preliminary EA and draft FONNSI and new information relating to the project that was received after the preparation of the preliminary EA/FONNSI, MMS issued a finalized EA/FONNSI on April 28, 2010.  Id.

The NHPA Section 106 process began during the Corps' review of the Cape Wind Project. ROD at 65.  MMS commenced its Section 106 process in late 2005, and conducted more than

twenty-one meetings with the Massachusetts SHPO, the ACHP, and other consulting parties, including the Wampanoag Tribe of Gay Head (Aquinnah) and the Mashpee Wampanoag Tribe. Id. at 66-67. Despite the extensive consultation, MMS and the various consulting parties were unable to reach agreement regarding a proposed memorandum of agreement ("MOA") to address mitigation measures. Id. at 69. On March 1, 2010, the Secretary determined that further efforts to reach agreement would not be productive and terminated consultation and submitted a request for comments to the ACHP. Id. The ACHP submitted comments to the Secretary on April 2, 2010, id. at 71, and on April 28, 2010, before issuing the ROD, the Secretary responded to those comments, stating that the views of ACHP were taken into account as MMS considered the effects of the Cape Wind Project. See April 28, 2010 Letter from Ken Salazar, Secretary of the Interior, to John L. Nau III, Chair, ACHP ("April 28, 2010 Letter"), at 1, Def. Ex. 2.

The ROD requires certain mitigation measures to be undertaken by CWA to avoid or minimize impacts to historic and cultural resources. ROD at 41-42. These measures include additional survey work in the form of: (1) a supplemental survey (high-resolution geophysical, magnemometer, side-scan sonar) of the entire Wind Turbine Generator Array Field/Grid out to 1,000 feet beyond the physical area of potential effect ("APE"); (2) a supplemental survey of the proposed transmission line corridor, which should be a minimum of 300m wide, or wider if needed, to encompass all bottom disturbing activities; (3) extraction of one or more cores from the location of each Wind Turbine Generator, which will be subject to geotechnical analysis for the presence/absence of preserved landscapes or paleosols, and which will be subject to examination by an archaeologist and a tribal representative, as well as a geoscientist "to confirm the absence or presence of any indicators suggesting the possibility of cultural habitation." Id. In addition, the

ROD specifies that: (1) in potential areas likely to involve shipwrecks or other historic and cultural resources in the vicinity of Horseshoe Shoal, MMS will apply appropriate buffer zones to avoid any disturbance of these resources; (2) MMS "will require additional predictive modeling and settlement pattern analysis to avoid areas most likely to contain and preserve archaeological sources;" (3) all surface disturbing work within the APE will be monitored by an archaeologist and a Tribal representative. ROD at 42. The ROD also sets out the procedures, including the "stop work" requirements, that must be followed in the event of an unanticipated discovery. Id. at 23. MMS will also require mitigation measures to the design and configuration of the Wind Turbine Generators to minimize or mitigate the effects to the visual setting of thirty-four historic properties. See April 28, 2010 Letter at 6.

**B.     The Record of Decision**

On April 28, 2010, after the Secretary responded to the ACHP comments, MMS issued the ROD signed by the Secretary documenting the Department's decision to issue a lease to CWA. ROD at 1. The decision documented in the ROD was to offer a commercial lease to CWA, granting it the exclusive right to apply for approval of a COP and authorizing CWA to conduct certain survey activities in the leasehold. See ROD at 4. The ROD, however, does not authorize the construction or operation of CWA's proposed wind energy facility on the OCS in Nantucket Sound. See ROD at 4. Rather, the decision made in the ROD to offer a lease to CWA was made in accordance with Section 388 of EPAct, Subsection 8(p) of OCSLA, and BOEMRE's regulations, 30 C.F.R. Part 285. Id. The lease only authorizes CWA to conduct further site assessment activities and does not authorize construction or operation of the project. See id. at 4. In the ROD, MMS explained that:

> Prior to conducting any activities pertaining to construction of facilities for commercial operations, CWA must submit, and obtain MMS's approval of, its

11

[Construction and Operations Plan ("COP")].  The COP must be submitted prior to the end of the five-year Site Assessment Term as described in Addendum 'B' of the Lease.  MMS reserves the right to approve, disapprove, or approve with modifications the COP, pursuant to the Renewable Energy Final Rule and other applicable regulations.

Id.

As of the filing of this brief, BOEMRE has not yet issued a lease to CWA.  See Declaration of Walter D. Cruickshank, Deputy Director of BOEMRE ¶ 9.  When BOEMRE does issue a lease to CWA, as described in the ROD, the lease will authorize further site assessment activities but cannot and will not authorize a COP.  Id. ¶ 8.  BOEMRE may only approve a COP after CWA has submitted all of the required materials and BOEMRE has evaluated CWA's submission.  Id. ¶¶ 10-12.  BOEMRE has not yet received a complete COP and all of the materials required to accompany a COP from CWA.  Id. ¶ 17.  Prior to a determination as to whether to approve, approve with modifications, or disapprove a COP, BOEMRE will conduct an appropriate environmental review pursuant to NEPA.  Id. ¶ 20; see also 30 C.F.R. § 285.628(b).  In its environmental review, BOEMRE will consider additional information obtained since the completion of the FEIS and EA/FONNSI, including, but not limited to, the Federal Aviation Administration's ("FAA") Final Determination of No Hazard to Air Navigation issued on May 17, 2010 and the results of consultation with the National Marine Fisheries Service ("NMFS") regarding potential impacts to marine mammals, which was reinitiated in July 2010.  Id. ¶ 21.  A COP could only be approved after the required materials have been submitted and BOEMRE completes the appropriate NEPA review and the agency determines that approval or approval of the COP with modifications is warranted.  Id. ¶ 24.  If a completed COP is not submitted or if BOEMRE does not approve a completed COP

12

within the initial 5-year site assessment term of the lease, then the lease would be terminated and no wind energy facility would be developed under the lease.  See ROD at 4-5.

### C.    Plaintiff's Complaint

On June 25, 2010, Plaintiff filed suit alleging that BOEMRE's decision to issue a lease to CWA for the potential development of an offshore wind energy facility violated NEPA, OCSLA, the CGMTA, and the NHPA.  See Complaint ¶¶ 1, 124-83.  Although Plaintiff challenges the issuance of the lease, their claims and alleged injuries do not relate to the decision that BOEMRE actually made, authorizing further site assessment activities and granting the exclusive right to apply for approval of a COP.  Rather, Plaintiff's claims and alleged injuries relate exclusively to the potential effects that could result from construction and operation of a wind energy facility in Nantucket Sound, an action that BOEMRE has not yet decided to approve or disapprove.  Plaintiff alleges that Defendants violated NEPA by failing to sufficiently analyze the potential environmental effects of construction and operation of a wind energy facility.  See Complaint ¶¶ 1 ("The Project would place 130 wind turbine generators, each 440 feet tall, in an area that approximately 400,000 aircraft fly over, through or near annually."), 128-48, 158-63 (Second, Third, Fourth, Fifth, and Seventh Claims for Relief).  Similarly, Plaintiff alleges that BOEMRE violated the EPAct and OCSLA by failing to comply with provisions requiring that the project be conducted in a manner that ensures the safety of aviation, commercial shipping, and marine navigation – all activities that will not be affected unless construction is approved.  See ¶¶ 124-27, 164-68 (First and Eighth Claims for Relief).  Plaintiff's CGMTA claims relate to effects on marine navigation, which would not arise unless construction is authorized at a future date.  See id. ¶¶ 169-74 (Ninth Claim for Relief).[2]

---

[2]    Plaintiff has not named the U.S. Coast Guard as a Defendant, but Plaintiff's counsel has informed Defendants that Plaintiff intends to amend the complaint to do so.  Accordingly,

Finally, Plaintiff's NHPA claim alleges that the construction and operation of a wind energy facility would affect historic and cultural resources, which likewise would not be affected unless BOEMRE were to approve a COP authorizing construction of such a facility.  See id. ¶¶ 149-57, 175-83 (Sixth and Eleventh Claims for Relief).[3/]

The injuries that Plaintiff alleges all relate exclusively to the potential effects of potential construction and operation of a wind energy facility, should BOEMRE ultimately authorize such construction and operation.  See id. ¶¶ 54-64 (alleging that construction of the wind turbines will have impacts on aviation and on air traffic flying into and out of Barnstable Municipal Airport).  Further, the relief that Plaintiff seeks makes clear that their case deals exclusively with issues surrounding the potential effects of the construction and operation of a wind energy facility.  See id. at 44 (requesting that the Court "[e]njoin Defendants from issuing a lease to CWA for the purpose of *constructing* the Proposed Project) (emphasis added).

## III.    Standards of Review

### A.    Motion to Dismiss Under Fed. R. Civ. P. 12(b)(1)

"Federal courts are courts of limited jurisdiction."  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction."  Id. (internal citation omitted).  Because jurisdiction goes to the Court's power to hear the claim, the plaintiff's allegations must be given closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim.  See Macharia v. United

---

Defendants treat the complaint as if the Coast Guard is a named Defendant.

[3/]    The Sixth and Eleventh Claims for Relief appear to be identical.  There is no Tenth Claim for Relief.

<u>States</u>, 334 F.3d 61, 64 (D.C. Cir. 2003).  Furthermore, in deciding a motion to dismiss under Rule 12(b)(1), the Court "may consider materials outside the pleadings."  <u>Jerome Stevens Pharms., Inc. v. FDA</u>, 402 F.3d 1249, 1253 (D.C. Cir. 2005); <u>Coalition for Underground Expansion v. Mineta</u>, 333 F.3d 193, 198 (D.C. Cir. 2003).

### B.      Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)

A motion to dismiss under Rule 12(b)(6) challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim.  The Court treats the factual allegations as true, drawing all reasonable inferences in the plaintiff's favor.  <u>Macharia</u>, 334 F.3d at 64, 67.  However, the facts alleged "must be enough to raise a right to relief above the speculative level."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).  Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment]to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  <u>Id.</u> at 555 (internal citation omitted).  Courts need not accept as true "'naked assertion[s]' devoid of 'further factual enhancement,'" <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (quoting <u>Twombly</u>, 550 U.S. at 557), or "legal conclusions cast in the form of factual allegations."  <u>Kowal v. MCI Commc'ns Corp.</u>, 16 F.3d 1271, 1276 (D.C. Cir. 1994); <u>Browning v. Clinton</u>, 292 F.3d 235, 242 (D.C. Cir. 2002).  "In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice."  <u>Stewart v. National Educ. Ass'n</u>, 471 F.3d 169, 173 (D.C. Cir. 2006).

**ARGUMENT**

I.   **The Court Lacks Jurisdiction Over Plaintiff's Claims Because They Are Not Ripe for Review**

The Court should dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(1) or, in the alternative, Fed. R. Civ. P. 12(b)(6).  Plaintiff's claims are not ripe for review due to the fact that BOEMRE's decision to issue a lease only grants CWA the exclusive right to apply for approval of a COP and allows CWA to conduct further site assessment activities but does not authorize construction and operation.  BOEMRE has reserved full discretion to approve or deny a request to approve construction and operation of a wind energy facility in Nantucket Sound.  Further, there are several regulatory steps left to be taken before BOEMRE can consider approving a COP.  It is therefore far from certain whether construction or operation will be approved.  Accordingly, Plaintiff's claims are not ripe for review.

A.   **Plaintiff Must Demonstrate that Its Claims Are Ripe for Review**

Federal courts lack subject matter jurisdiction where a plaintiff cannot show that an actual case or controversy exists.  See U.S. Const. art. III, § 2; Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 102 (1998).  "At the most elemental level, the constitutional minimum for the exercise of our jurisdiction is a dispute presenting a justiciable 'case or controversy.'" Wyoming Outdoor Council v. U.S. Forest Serv., 165 F.3d 43 (D.C. Cir. 1999) ("Wyoming Outdoor Council I") (citations omitted).  It is the Plaintiff's burden to demonstrate that the requirements of Article III are satisfied, thus establishing the Court's jurisdiction to hear their claims.  See Steel Co., 523 U.S. at 103-04; Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377 (1994).

16

The ripeness doctrine arises from Article III's case or controversy requirement. "Closely akin to the standing requirement, and indeed not always clearly separable from it, is the ripeness doctrine. . . . Under that doctrine, an Article III court cannot entertain the claims of a litigant unless they are 'constitutionally and prudentially ripe.'" Wyoming Outdoor Council I, 165 F.3d at 48 (quoting Louisiana Envtl. Action Network v. Browner, 87 F.3d 1379, 1384 (D.C. Cir. 1996)). "Just as the constitutional standing requirement for Article III jurisdiction bars disputes not involving injury-in-fact, the ripeness requirement excludes cases not involving present injury." Wyoming Outdoor Council I, 165 F.3d at 48; see also National Treasury Employees Union v. United States, 101 F.3d 1423, 1427 (D.C. Cir. 1996). The ripeness doctrine is designed to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967).

"A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Nevada v. Dept. of Energy, 457 F.3d 78, 85 (D.C. Cir. 2006) (quoting Texas v. United States, 523 U.S. 296, 300 (1998)); see also Atlantic States Legal Found. v. Envtl. Prot. Agency, 325 F.3d 281, 284 (D.C. Cir. 2003). "[W]hen an agency decision may never have 'its effects felt in a concrete way by the challenging parties,' Abbott Labs., 387 U.S. at 148-49, the prospect of entangling ourselves in a challenge to such a decision is an element of the fitness determination as well." Devia v. Nuclear Reg. Comm'n., 492 F.3d 421, 424 (D.C. Cir. 2007) (citing Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 162-63 (1967); see also CTIA-The Wireless Association v. Fed. Comm. Comm'n, 530 F.3d 984 at 987 (D.C. Cir. 2008).

17

The ripeness doctrine involves both constitutional and prudential considerations. Courts are instructed to "go beyond constitutional minima and take into account prudential concerns which in some cases may mandate dismissal even if there is not a constitutional bar to the exercise of our jurisdiction." Wyoming Outdoor Council I, 165 F.3d at 48. In determining whether the plaintiff's claims are ripe for review, a court "must examine the 'fitness of the issues for judicial decision' and the 'hardship to the parties of withholding court consideration.'" Id. at 48 (quoting Abbott Labs., 387 U.S. at 149). The Supreme Court has clarified that, in considering these two factors, courts should consider: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." Ohio Forestry Assoc., Inc. v. Sierra Club, 523 U.S. 726, 733 (1998).

### B.     Plaintiff's NEPA Claims Are Not Ripe for Review

Plaintiff's NEPA claims are not ripe for review because those claims allege that BOEMRE failed to properly analyze the environmental impacts of constructing and operating a wind energy facility, an action the agency simply has not taken. Although couched as a challenge to the NEPA analysis relating to the issuance of the lease, Plaintiff's claims allege failure to analyze the environmental impacts of the actual construction and operation of a wind energy facility in Nantucket Sound. See Complaint ¶¶ 128-48, 158-63. These claims are not ripe on constitutional and prudential grounds because BOEMRE has made no commitment to approve the construction of any facility in Nantucket Sound and indeed has retained the right to fully deny the construction of any facility. Further, BOEMRE will conduct an environmental review under NEPA before BOEMRE decides whether to approve the construction of a wind energy facility. Should CWA

18

submit a complete application for a COP approval to BOEMRE, the agency would, at a minimum consider any new environmental reports and information that were not available when BOEMRE prepared the FEIS and EA/FONNSI that may have a bearing on the potential environmental effects of the construction and operation of the proposed wind energy facility. Moreover, Plaintiff will suffer no injury from the Court's deferral of their NEPA claims challenging the adequacy of the NEPA analysis pertaining to the construction and operation of a wind energy facility because such construction and operation has not been approved and may in the future be approved in a different form or not at all.

### 1. Plaintiff's NEPA Claims Are Not Constitutionally Ripe for Review

Plaintiff's NEPA claims are not constitutionally ripe for review because BOEMRE has not yet acted upon an application for construction and operation of a wind energy facility and therefore BOEMRE's obligation to prepare a NEPA analysis for the construction and operation of such a facility has not yet matured. The D.C. Circuit has found that "an agency's NEPA obligations mature only once it reaches a 'critical stage of a decision which will result in irreversible and irretrievable commitments of resources' to an action that will affect the environment.'" Center for Biological Diversity v. U.S. Dep't of the Interior, 563 F.3d 466, 480 (D.C. Cir. 2009) (quoting Wyoming Outdoor Council I, 165 F.3d at 49). "NEPA does not intend that [an agency] may be indefinitely delayed in undertaking its statutory duties by controversy over an EIS concerning events which may never occur." Wyoming Outdoor Council I, 165 F.3d at 49 (quoting Mobil Oil Corp. v. FTC, 562 F.2d 170, 173 (2d Cir. 1977)).

In determining whether a NEPA claim is ripe for review in the context of a multi-stage leasing program, an important factor is whether the agency has retained the authority to preclude any

ground disturbing activities.  The D.C. Circuit has held that "when a federal agency charged with administering oil and gas leasing on federal lands has taken such action that it no longer retains the authority to preclude all surface disturbing activities subsequent to issuance of an oil and gas lease, an EIS assessing the full environmental consequences of leasing must be prepared before commitment to any actions that might affect the quality of the human environment."  Wyoming Outdoor Council I, 165 F.3d at 49 (quoting Sierra Club v. Peterson, 717 F.2d 1409, 1415 (D.C. Cir. 1983) (quotations omitted); see also Conner v. Burford, 848 F.2d 1441, 1451 (9th Cir. 1988) ("[U]nless surface-disturbing activities may be absolutely precluded, the government must complete an EIS before it makes an irretrievable commitment of resources by selling [surface disturbing] leases.").  Thus, in Wyoming Outdoor Council I, in the context of the multi-stage leasing process applicable to onshore oil and gas leasing, where the issuance of a lease precluded the government from subsequently preventing all surface disturbance, the D.C. Circuit held that the "point of irreversible and irretrievable commitment of resources and the concomitant obligation to fully comply with NEPA do not mature until leases are issued."  165 F.3d at 49; see also Wyoming Outdoor Council v. Dombeck, 148 F. Supp. 2d 1, 10 (D.D.C. 2001) ("Wyoming Outdoor Council II") (relying on Wyoming Outdoor Council I and finding that, because the government had reserved the right to prevent all surface disturbing activities, claims challenging the sale of oil and gas leases by BLM were not ripe for review).

The D.C. Circuit recently reaffirmed its holding in Wyoming Outoor Council I that, in the context of a multi-stage leasing process, the obligation to prepare a NEPA document does not mature until the agency makes a decision that results in an "irreversible and irretrievable commitment of resources" to a project that will have significant environmental effects.  See Center

20

for Biological Diversity, 563 F.3d at 480.  The court rejected the argument that the Supreme Court's decision in Ohio Forestry dictates when a NEPA claim is ripe for review.  See id. at 481-82.  In Ohio Forestry, the Supreme Court stated in *dicta* that "a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper."  523 U.S. at 737.  However, as the D.C. Circuit explained, the Supreme Court was noting "only that NEPA claims do not get riper than they are at the moment a violation occurred.  It was not resolving the point at which such a violation would occur."  Center for Biological Diversity, 563 F.3d at 481.  The D.C. Circuit filled the gap by holding that an agency's NEPA obligations do not mature until the agency has made an "irreversible and irretrievable commitment of resources."  Id.

The point of "irreversible and irretrievable commitment of resources" indicating when a NEPA claim is ripe for review may not occur at the lease stage, depending on what activities the lease authorizes.  In a case involving a multi-stage leasing program under the Federal Onshore Oil and Gas Leasing Reform Act ("FOOGLRA"), this Court found that claims alleging environmental injury were not ripe for review even though the Bureau of Land Management ("BLM") had issued oil and gas leases.  Wyoming Outdoor Council v. Bosworth, 284 F. Supp.2d 81, 89-93 (D.D.C. 2003) ("Wyoming Outdoor Council III").  Under FOOGLRA, the Forest Service and BLM share responsibility for the allocation of lands for oil and gas leasing according to an eight-step process. Id. at 83.  The final four steps are:  "(5) sale [of a lease] by BLM; (6) issuance of a lease; (7) application for permit to drill; and (8) application for a permit to drill to develop a field."  Id.  In the seventh step, after the lease is issued, an applicant must still submit an Application for Permit to Drill ("APD") which includes a Surface Use Plan of Operation ("SUPO").  The Forest Service may

21

approve, approve with conditions, or deny the SUPO.  Id.  In the final step, the lessee must submit

additional plans for approval prior to conducting field-development activities.  Id.

Based upon the multi-stage regulatory scheme and the authorizations that had been issued

to that point, the Court found that the claims were not ripe for review because the plaintiffs' claims

rested upon future contingent events that might not occur as expected or might never occur.  Id. at

90-91.  Although a lease had been issued, the Court pointed out that the lease was subject to

reservations.  Id. at 91.  Further, prior to any oil and gas operations, the applicant would be required

to obtain approval of an APD and SUPO, which could be denied by the agency and which would

be subject to further NEPA review.  Id. at 92.  Based on these factors, the Court found that "while

the lessee clearly has a legal right to apply for permission to conduct oil and gas operations, his right

to development of the lease parcel is far from certain."  Id.  Thus, the agencies had not made an

irreversible and irretrievable commitment of resources to allow surface-disturbing activities and,

therefore, the claims were not ripe for review.  Id. at 93.

In this case, Plaintiff's NEPA claims alleging injuries from the potential construction and

operation of a wind energy facility in Nantucket Sound are not ripe for review because BOEMRE

has not made any irreversible or irretrievable commitment of resources towards the construction and

operation of a wind energy facility.  Like the regulatory approval process in Wyoming Outdoor

Council III, the regulatory process for approval of an offshore wind energy facility is a multi-stage

process, which normally occurs in three stages: (1) issuance of a lease, (2) approval of a SAP, and

(3) approval of a COP.  See Background, Section I.B., *supra*; 30 C.F.R. §§ 285.600 - 285.629.

With respect to the Cape Wind Project, a SAP was effectively approved by the Corps prior

to BOEMRE's involvement and BOEMRE has now approved the issuance of a lease, but BOEMRE

has not approved a COP.  See ROD at 3-4; Cruickshank Decl. ¶ 8.  In the ROD, BOEMRE explains that:

> The COP must be submitted prior to the end of the five-year Site Assessment Term as described in Addendum 'B' of the Lease.  MMS reserves the right to approve, disapprove, or approve with modifications the COP, pursuant to the Renewable Energy Final Rule and other applicable regulations.

Id.

Thus, the circumstances in this case are very similar to the circumstances in Wyoming Outdoor Council III.  Although the issuance of a lease has been approved, the decision does not authorize surface disturbing activities relating to construction.  ROD at 4; Cruickshank Decl. ¶¶ 8, 10.  Prior to any actual development of the lease, CWA must seek and obtain approval of a COP and BOEMRE must ensure that it has prepared an appropriate NEPA analysis.  See 30 C.F.R. § 285.628(b); Wyoming Outdoor Council III, 284 F. Supp.2d at 92 (noting that before surface disturbing activities could be authorized, "the agencies must verify that leasing on the applicant's parcel has been adequately addressed in a NEPA document").  BOEMRE has retained the authority to deny a COP to CWA and thus has not made an irreversible or irretrievable commitment of resources to the development of a wind energy facility.  See id. at 93; Wyoming Outdoor Council I, 165 F.3d at 49.

Furthermore, Plaintiff's claims are not ripe because the actual development of a wind energy facility in Nantucket Sound depends on contingent future events, not the least of which is the approval of a COP.  See Nevada, 457 F.3d at 85; Atl. States, 325 F.3d at 284.  The lease issued to CWA authorizes it to conduct additional site assessment activities to gather data which will be used in preparing its COP.  ROD at 4.  CWA must prepare its COP within the next five years and it must be approved by BOEMRE before any construction of a wind energy facility is authorized.  Id.; 30

23

C.F.R. § 285.620.  Assuming that CWA submits a COP within the next five years, BOEMRE must

ensure that an "appropriate NEPA analysis" is prepared before approving a COP.  30 C.F.R.

§ 285.628(b); Cruickshank Decl. ¶ 20.  At that point, CWA's COP may be approved, denied, or

approved with modifications.  ROD at 4; 30 C.F.R. § 285.628(f).  Thus, Plaintiff's NEPA claims

"rest upon contingent future events that may not occur as anticipated or indeed may not occur at all."

Wyoming Outdoor Council III, 284 F. Supp.2d at 90-91 (quoting Atl. States, 325 F.3d at 284).

Finally, the Plaintiff has alleged no present or imminent injury from BOEMRE's approval

of additional surveying activities in Nantucket Sound.  Although BOEMRE has authorized the

issuance of a lease to CWA, that decision will not lead to the potential harms alleged by Plaintiff

unless further action is taken by the agency approving a COP.  All of Plaintiff's alleged injuries arise

from the construction and operation of a wind energy facility, assuming that such construction and

operation is approved at some point in the future, not from the issuance of a lease.  See Complaint

¶¶ 54-64 (alleging that construction of the wind turbines will have impacts on aviation and on air

traffic flying into and out of Barnstable Municipal Airport).  Because the construction of the wind

energy facility has not been approved and approval in the future is unknown, Plaintiff fails to allege

any present or imminent injuries satisfying the case or controversy requirement of Article III.  See

Whitmore v. Arkansas, 495 U.S. 149, 158 (1990) ("Allegations of possible future injury do not

satisfy the requirements of Art. III."); Wyoming Outdoor Council I, 165 F.3d at 48 ("Just as the

constitutional standing requirement for Article III jurisdiction bars disputes not involving injury-in-

fact, the ripeness requirement excludes cases not involving present injury.").[4]

---

[4] For the same reason, Plaintiff lacks standing because they cannot demonstrate any imminent
injury.  See Summers v. Earth Island Inst., 129 S.Ct. 1142, 1151 (2009).  In also Wyoming
Outdoor Council I, the D.C. Circuit recognized the overlapping nature of the standing and
ripeness doctrines: "Applying these principles in the context of leasing, we conclude that WOC

### 2.      Plaintiff's NEPA Claims Are Not Prudentially Ripe for Review

Prudential considerations bolster the conclusion that Plaintiff's NEPA claims are not ripe for review because they are not fit for review and deferring judicial review will not harm Plaintiff.  See Ohio Forestry, 523 U.S. at 732; Abbott Labs., 387 U.S. at 149.  "Prudence . . . restrains courts from hastily intervening into matters that may best be reviewed at another time or another setting, especially when the uncertain nature of an issue might affect a court's ability to decide intelligently." Wyoming Outdoor Council I, 165 F.3d at 50 (quoting Louisiana Envtl. Action Network v. Browner, 87 F.3d 1379, 1382 (D.C. Cir. 1982) (internal quotations omitted).  As explained below, judicial review of Plaintiff's NEPA claims regarding the construction of a wind energy facility will benefit from allowing the administrative and regulatory processes to be completed, and Plaintiff will suffer no injury if judicial review is deferred until that time.

### a.      The Court's Evaluation of Plaintiff's Claims Will Benefit from Further Factual Development

In considering whether prudential considerations weigh in favor of deferring judicial review, the Court should consider "whether the courts would benefit from further factual development." Ohio Forestry, 523 U.S. at 733; see also Nat'l Treasury Employees Union v. Chertoff, 452 F.3d 839, 854 (D.C. Cir. 2006) ("Gauging an issue's fitness for review involves assessing: whether the agency action is final; whether the issue presented for decision is one of law which requires no additional factual development; and whether further administrative action is needed to clarify the agency's position.").  This consideration supports deferring judicial review of Plaintiff's NEPA claims.

---

has not established the irreversible and irretrievable commitment of resources necessary to establish ripeness, whether or not it has established the element of injury redressable in this litigation necessary to establish standing.  However viewed, we lack jurisdiction."  165 F.3d at 49.

Here, before BOEMRE makes a decision as to whether to approve a COP, it must first determine that the COP is supported by an "appropriate NEPA analysis." 30 C.F.R. § 285.628(b). In order to ensure that its NEPA obligations are met, if CWA submits a completed COP, BOEMRE will conduct an environmental review under NEPA before determining whether to approve a COP. Cruickshank Decl. ¶ 20.  At a minimum, BOEMRE would prepare an EA to determine whether there is any significant new information relating to CWA's proposed project.  Id. ¶ 20.   In the EA, BOEMRE would consider a number of reports and agency determinations that have been issued since the completion of the FEIS and EA/FONNSI or that have yet to be issued.  Id. ¶ 21.   For example, BOEMRE would consider an Oil Spill Response Plan and Operations and Management and Maintenance Plan prepared by CWA and the results the FAA's Determination of No Hazard to Air Navigation, which was issued on May 17, 2010.  Cruickshank Decl. ¶¶ 19, 21.   BOEMRE also has re-initiated consultation with NMFS regarding the potential impacts of developing a wind energy facility on marine mammals and is awaiting the results of that consultation.  Id. ¶ 22. Assuming that an application for a COP is submitted, BOEMRE would consider all of the information obtained since the issuance of the ROD, and only then would BOEMRE issue a decision regarding a COP.  Id. ¶ 24.   Accordingly, judicial review of Plaintiff's NEPA claims would be premature.

> **b.     A Court Decision on Plaintiff's NEPA Claims May Interfere With Ongoing Regulatory Processes**

The Court should also consider whether judicial review of Plaintiff's NEPA claims at this point in time will affect the agency's ongoing administrative process. See Ohio Forestry, 523 U.S. at 733.  As demonstrated above, BOEMRE's process for considering and approving an actual plan that would authorize construction and operation is far from complete.  Judicial review of Plaintiff's

NEPA claims would, at the very least, cause BOEMRE to devote substantial resources to litigation that could otherwise be devoted to considering CWA's application for COP approval, should such an application be submitted, and completing the administrative process.  In addition, this is the first time that BOEMRE's regulations have been applied to an application to develop a wind energy facility on the OCS – indeed, the proposed project is the first of its kind.  Premature judicial review before the agency actually makes a decision whether or not to approve a COP without full consideration of the agency's complete decisionmaking process could have the effect of impeding BOEMRE's ability to administer the offshore alternative energy leasing program.

### c.        Deferring Judicial Review Would Not Harm Plaintiff

Finally, in weighing the prudential factors, the Court should consider whether any harm to Plaintiff will result from deferring judicial review.  Ohio Forestry, 523 U.S. at 733-34.  Plaintiff must demonstrate that any hardship would be significant and that it would outweigh the harms to the government from immediate judicial review.  See Devia, 492 F.3d at 427 ("In order to outweigh institutional interests in the deferral of review, the hardship to those affected by the agency's action must be immediate and significant."); Center for Biological Diversity, 563 U.S. at 480 ("[A]ny harm that might befall Petitioners by having to wait until the actual leasing stage to bring their claims is outweighed by the harm to Interior (and other agencies).").  Here, Plaintiff can point to no injury or hardship that it would suffer by having to wait to litigate their NEPA claims until BOEMRE reaches a decision as to whether to approve a COP.

In sum, Plaintiff has failed to meet the constitutional minima for demonstrating an actual case or controversy with respect to its NEPA claims and prudential considerations also weigh in favor of deferring judicial review.  Therefore, Plaintiff's NEPA claims are not ripe for review.

### C.      Plaintiff's OCSLA Claims Are Not Ripe for Review

Plaintiff's OCSLA claims are not ripe for the same reasons that their NEPA claims are not ripe.  Plaintiff alleges that BOEMRE has failed to comply with statutory provisions requiring the Secretary to ensure that the development of the wind energy facility will be conducted in a manner that ensures public safety, protection of the environment, and coordination with other federal agencies.  See Complaint ¶¶ 124-27, 164-68; 43 U.S.C. §§ 1337(p)(4)(A), B) & (E).  These statutory requirements would only be triggered if BOEMRE decides to approve a COP authorizing the construction and operation of a wind energy facility.  BOEMRE has not committed to approving any COP and has reserved all discretion to deny a COP and any associated ground-disturbing activities. Plaintiff's OCSLA claims assume that a COP will inevitably be granted in the future and thus "rest upon contingent future events that may not occur as anticipated or indeed may not occur at all." Wyoming Outdoor Council III, 284 F. Supp.2d at 90-91 (quoting Atl. States, 325 F.3d at 284). Further, the same prudential considerations render Plaintiff's OCSLA claims not ripe for review. A decision under OCSLA to approve a COP could only be made after BOEMRE receives a completed COP application, considers additional information, and conducts additional environmental review pursuant to NEPA.  Cruickshank Decl. ¶ 24.  Accordingly, the OCSLA claims are not ripe for review.

### D.      Plaintiff's CGMTA Claims Are Not Ripe for Review

Plaintiffs' CGMTA claims against the Coast Guard are not ripe for review.  Plaintiffs allege that the Coast Guard violated section 414 of the CGMTA by failing to properly craft terms and conditions regarding navigational safety with respect to the development of a wind energy facility in Nantucket Sound.  Complaint ¶¶ 169-74.  Section 414 of the CGMTA requires the Coast Guard,

which serves as a consulting agency to BOEMRE during the OCS renewable energy leasing process, to develop terms and conditions "to provide for navigational safety" and requires the BOEMRE to incorporate those terms and conditions into a lease, easement or right-of-way.  See Pub. L. 109-241, 120 Stat. at 540.  Plaintiffs' CGMTA claim against the Coast Guard is not ripe because, unless and until BOEMRE approves a COP, it is uncertain whether the development of a wind energy facility will ever occur and thus whether the Coast Guard's Terms and Conditions will ever have any legal effect.[5]  See Atl. States, 325 F.3d at 284.

Although the Coast Guard has specified to BOEMRE the Terms and Conditions for the lease in  compliance with its statutory obligations under the CGMTA, the Coast Guard's consulting role in the Cape Wind Project will continue with regard to navigation safety.  The Coast Guard has indicated that it may develop further measures to mitigate impacts to marine navigation that may arise during construction and operation of a wind energy facility, should BOEMRE approve a COP. ROD at 44.  Such mitigation measures, which are issued under Coast Guard authority extrinsic to the CGMTA[6], may not be developed until CWA submits a COP.  See id.  Thus, it would be premature for the Court to review issues of navigation safety by only looking at the Terms and Conditions.  See Abbott Labs., 387 U.S. at 148-49 (stating that the ripeness doctrine is designed to "protect the agencies from judicial interference until an administrative decision has been formalized

---

[5]      It is questionable whether the Coast Guard's issuance of Terms and Conditions constitute agency action reviewable under the APA, 5 U.S.C. § 704.  The Coast Guard preserves its right to raise this issue in later briefing.

[6]      Other Coast Guard authorities, including the Ports and Waterways Safety Acts ("PWSA"), 33 U.S.C. § 1221 et seq., and the Marine Transportation Security Act of 2002, Pub. L. 107-295, as amended, 46 U.S.C. Chapter 701, provide broad statutory authority to the Coast Guard to manage risk on the nation's waterways, including all waterways within Nantucket Sound.

and its effects felt in a concrete way by the challenging parties"); City of Falls River, Massachusetts v. FERC, 507 F.3d 1, 7-8 (1st Cir. 2007) ("Given that decisive questions remain open, we think it wiser to allow the agencies to continue their decision-making process at least until final authorization is granted."). Plaintiffs can bring their suit at a later time, after "harm is more imminent and more certain." Ohio Forestry, 523 U.S. 1665, at 1671 (1998).  Deferring consideration of this dispute until that point serves important interests both in avoiding interference with the administrative decision process, and in judicial economy.  Accordingly, the claims against the Coast Guard are not ripe for judicial review.

### E.    Plaintiff's NHPA Claims Are Not Ripe for Review

Plaintiff's NHPA claims relating to potential adverse effects on historic properties are not ripe for review because the claims are based on the actual construction and operation of a wind energy facility, not the issuance of a lease.  See Complaint ¶¶ 149-157, 175-83.  Although the NHPA Section 106 review process was completed on April 28, 2010, pursuant to 36 C.F.R. § 800.7, like Plaintiff's other claims, the NHPA claims rest upon "contingent future events that may not occur as anticipated or indeed may not occur at all," namely approval of the COP, and therefore are not ripe for review.  Wyoming Outdoor Council III, 284 F. Supp. 2d at 89 (internal quotation marks omitted) (quoting Alt. States, 325 F.3d at 284); see also Friends of Hamilton Grange v. Salazar, Case No. 2009 WL 650262, at *17 (S.D.N.Y. Mar. 12, 2009) (stating in the NHPA context that the "'fitness' analysis is concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur").  For example in Taxpayers Opposed to Oz, Inc. v. Barram, Case No. 2000 WL 1595754 at *3-5 (D. Kan. Oct. 16, 2000), the district court found that a challenge under the NHPA and NEPA to a proposed transfer of an Army ammunition plant was not ripe where

the agency had not finished all of the required review processes and made a decision with respect to the proposed project.  The court was persuaded in part by practical considerations, finding it would not be logical to consider the NHPA and NEPA review processes in isolation, as "[b]ifurcating the judicial review of the two agency actions would result in review of related facts twice."  Id at *4.  Similarly, reviewing Plaintiff's NHPA claims prior to completion of the approval process for a COP following appropriate NEPA analysis would force this Court to review related facts twice.

Further, just as under NEPA, Plaintiff has alleged no present or imminent injury to historic resources to establish an imminent injury for purposes of establishing a case or controversy under Article III.  See Wyoming Outdoor Council I, 165 F.3d at 48 ("Article III does not allow a litigant to pursue a cause of action to recover for an injury that is not 'certainly impending'").  Rather, all of the alleged adverse impacts to historic resources arise from the construction and operation of a wind energy facility, and require the presumption that such construction and operation will be approved at some point in the future.  See, e.g., Complaint ¶ 78 ("Given the spacing and geometry of the proposed WTG array, and the angles from which the array will be viewed from numerous sites within Barnstable's historic districts, one will view an almost continuous line of towers and moving blades and lights some forty stories high... across most, if not all, of the available view shed from given locations.").  Additionally, Plaintiff has not demonstrated that it would be harmed by deferring judicial review of its NHPA claims until a decision on whether to approve a COP has been made.  Based on the foregoing, this Court should find that Plaintiff's NHPA claims are not ripe for review at this point.

**CONCLUSION**

Accordingly, Defendants request that the Court dismiss all of Plaintiff's claims for lack of

jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

Respectfully submitted this 29th day of September, 2010.

IGNACIA S. MORENO
Assistant Attorney General

/s/ *Luther L. Hajek*
LUTHER L. HAJEK, D.C. Bar No. 467742
SAMANTHA F. KLEIN
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C.  20044-0663
Tel.: (202) 305-0492 / (202) 305-0474
Facsimile: (202) 305-0506
Luke.Hajek@usdoj.gov

Attorneys for Defendant

32

**CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2010, I electronically filed the foregoing

DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT AND MEMORANDUM

IN SUPPORT and EXHIBITS thereto with the Clerk of the Court using the CM/ECF system which

will send notification of such to counsel of record.


_____*/s/ Luther L. Hajek*_____
LUTHER L. HAJEK